UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

CARRI WILLIAMS,

                          Petitioner,

        v.

JO WOFFORD,

                          Respondent.

Case No. C20-1477-RSL-MLP

REPORT AND RECOMMENDATION

## I.    INTRODUCTION AND SUMMARY CONCLUSION

Petitioner Carri Williams is a state prisoner who is currently confined at the Washington Corrections Center for Women in Gig Harbor, Washington. She has filed, through counsel, a petition for writ of habeas corpus under 28 U.S.C. § 2254 seeking relief from her 2013 Skagit County Superior Court judgment and sentence. (Petition (Dkt. # 1).) Respondent filed an answer to the petition and submitted relevant portions of the state court record. (Answer (Dkt. # 14); State Court Recs. (Dkt. ## 15, 15-1, 15-2, 16, 16-1).) Petitioner filed a response to Respondent's answer (Pet.'s Resp. (dkt. # 23)), together with a declaration from Petitioner's counsel, James Lobsenz, to which additional portions of the state court record are attached (Lobsenz Decl. (dkt.

REPORT AND RECOMMENDATION
PAGE - 1

# 24)). Finally, Respondent filed a reply brief in support of her answer addressing the substantive arguments contained in Petitioner's response.[1] (Resp.'s Reply (Dkt. # 28).)

This Court, having reviewed the petition, all briefing of the parties, and the balance of the record, concludes that Petitioner's petition for writ of habeas corpus should be denied, and this action should be dismissed with prejudice.

## II.    FACTUAL AND PROCEDURAL BACKGROUND

The Washington Court of Appeals, on direct appeal, summarized the facts underlying Petitioner's conviction as follows:

> Carri and Larry [Williams] married in 1990. They have seven biological children. In August 2008, they adopted two children from Ethiopia, H.W. and I.W., who is deaf.
>
> Larry worked swing shift at his job, leaving home at noon and returning around midnight. Larry cooked the children breakfast every morning before work. He was frequently home on weekends. Carri, fluent in sign language, raised and home schooled the children and made them do chores around the house. She also made the children do "boot camp," a form of punishment consisting of extra chores both inside and outside the house.
>
> When H.W. first arrived at the Williamses' home, she behaved and integrated well. After the first year, she occasionally disobeyed the Williamses, such as taking food without permission. As a result, H.W. was not allowed to participate in some holiday activities and family events. When I.W. first arrived at the Williamses' home, he acted out aggressively and also occasionally disobeyed the Williamses.
>
> Both Carri and Larry disciplined their children. The Williamses punished I.W. and H.W. more than the other children, and their punishments increased in "severity" and "frequency" over time. Punishment included spankings with a belt, a wooden stick, or a glue stick and being hosed down with cold water outside. The Williamses spanked I.W. all over his body.

---

[1] Petitioner's petition was devoid of any substantive argument and, thus, Respondent, in her answer to the Petition, was able to address only the arguments made by Petitioner in her proceedings before the state courts.

REPORT AND RECOMMENDATION
PAGE - 2

The Williamses used food deprivation as punishment. They served cold food and leftovers, frozen vegetables, and sandwiches soaked in water to I.W. and H.W. but not the other children. They forced H.W. and I.W. to eat some of their meals outside in "any kind of weather." During the last six months of her life, H.W. ate breakfast and other meals outside "more times than not." Sometimes, when H.W. was placed outside, she would not come back inside "even though she was allowed back inside." The Williamses occasionally "didn't let her into the house to warm up."

The Williamses used isolation as punishment. At times, the Williamses forced H.W. to stay and sleep alone in the barn outside without electricity and to take cold showers outside. Other times, the Williamses forced H.W. to stay and sleep alone in a shower room. H.W. would generally stay outside "for long periods of time." Beginning in late 2010 and up until her death, the Williamses forced H.W. to stay and sleep alone in a closet at "night and during the day sometimes." The closet measured "two foot by four foot three inches." H.W. "wasn't able to stretch" or "change her position significantly" inside it. None of the other children were forced to sleep in the closet. The closet door was locked from the outside.

The Williamses used humiliation as punishment. When I.W. wet himself, the Williamses would hose him down with cold water and force him to sleep in the shower room. When he wet the bed, the Williamses would give him cold showers. H.W. had Hepatitis B. When she started menstruating, H.W. would smear "her menstrual blood on bathroom surfaces." Concerned that their other children would contract Hepatitis B, the Williamses purchased a port-a-potty, placed it outside, and frequently forced H.W. to use it. Carri also shaved off H.W.'s hair multiple times.

In Ethiopia, H.W. was "a healthy size and stature" for her age. "There was no evidence of malnutrition." When she first arrived at the Williamses home, H.W. "had fairly normal height and weight." During the first two years, H.W.'s weight increased steadily and overall "she was generally healthy." Her body weight was in the "90th percentile" of the body mass index chart (BMI), which is considered "overweight." By 2011, H.W.'s weight dropped from 110 pounds to around 80 pounds. When H.W. died, her weight was in the "third percentile" of the BMI.

On May 11, 2011, Larry left for work as usual around noon. Carri sent H.W. outside around 3:00 p.m. Initially, H.W. wore sweatpants and a long-sleeve shirt. The temperature was "in the mid- to upper fifties." It started to rain later that evening, and the temperature became "cold." Carri told H.W. to do exercises to keep warm. Carri told H.W. multiple times to come inside, but she refused. Carri told one of her daughters to check on H.W. every 10 or 15 minutes. Carri placed dry clothes outside for H.W. because the rain had soaked her clothes.

Around 8:30 p.m., Carri told H.W. to go to the port-a-potty. H.W. "took about ten or twenty steps, and she began throwing herself down" on her hands and

REPORT AND RECOMMENDATION
PAGE - 3

knees. H.W. repeated this behavior all the way to the port-a-potty. H.W. did the same thing on the way back to the house, hitting her forehead on the concrete patio several times. H.W. continued to "throw herself around" for "twenty or thirty minutes." Carri observed that H.W. "had skinned up her knees and her elbows quite a bit" and "had a knot on her forehead." Each time that one of Carri's daughters looked outside to check on H.W., H.W. had removed pieces of clothing until she was naked.

Shortly before midnight, one of Carri's daughters saw H.W. laying naked face down in the grass. Carri went to check on H.W. She tried to carry H.W. inside, but H.W. was too heavy. Carri grabbed a sheet to cover H.W.'s naked body. Carri's sons helped carry H.W. inside. Carri did not feel a pulse. She performed cardiopulmonary resuscitation (CPR), called Larry, and then dialed 911. Larry arrived and helped perform CPR before medics arrived. H.W. died at the hospital at 1:30 a.m.

A jury convicted Carri of homicide by abuse, first degree manslaughter, and first degree assault of a child. At sentencing, the court vacated the manslaughter conviction on double jeopardy grounds.

(State Court Rec. (Dkt. # 15-1), Ex. 3 at 2-6 (footnotes omitted).)

On collateral review, the Washington Court of Appeals set forth the following additional facts relevant to the claims raised by Petitioner in her personal restraint petition:

In the early hours of May 12, 2011, Carrie telephoned her husband, Larry, as he drove home from his job at Boeing. Carri told him that she had found their teenage daughter, [H.W.], lying face down in the backyard, naked and unconscious. After instructing Carri to call 9-1-1, Larry raced home and helped perform CPR until the medics arrived and transported [H.W.] to Skagit Valley Hospital. [H.W.] was pronounced dead at 1:30 a.m. on May 12, 2011.

A subsequent investigation revealed that Carri and Larry routinely physically and psychologically punished [H.W.], then a young teen, and I.W., a 9-year-old hearing-impaired boy, both of whom they had adopted from Ethiopia in 2008.

Dr. Daniel Selove, the forensic pathologist who performed [H.W.]'s autopsy, noticed that [H.W.] had visible injuries on her pelvis, elbows, knees, and calves; bruises on her knees, eyebrow and upper pelvis; and multiple impact marks on her thighs and calves. He determined that when she died, [H.W.] suffered from severe malnutrition, with an abnormally thin body and protruding ribs and shoulder blades. Dr. Selove identified [H.W.]'s cause of death as hypothermia, with malnutrition and a bacterial infection in her stomach, *h. pylori,* as contributing

REPORT AND RECOMMENDATION
PAGE - 4

factors. Dr. Rebecca Wiester, a Board-certified physician in child abuse pediatrics with malnutrition and hypothermia expertise, confirmed that [H.W.] died from hypothermia brought on by inflicted starvation.

When Child Protective Services (CPS) interviewed I.W. and the Williamses' seven biological children on May 24, 2011, the children revealed that Carri and Larry had regularly beaten I.W. and [H.W.], causing scars, had denied them food, had forced them to eat sandwiches soaked in water or eat frozen, uncooked vegetables while sitting outside on the back porch away from the family, and had forced [H.W.] and I.W. to sleep in a locked closet or shower room. CPS removed all of the children from the home in July 2011.

On September 9, 2011, the State charged Carri and Larry with homicide by abuse under RCW 9A.32.055 and the alternative crime of first degree manslaughter under RCW 9A.32.060 for the death of [H.W.], and assault of a child in the first degree under RCW 9A.36.120 for their mistreatment of I.W. On September 9, 2013, following a seven week jury trial, the jury found Carri guilty of all three charges.

On October 29, 2011, the trial court vacated Carri's manslaughter conviction on double jeopardy grounds, and it sentenced Carri to consecutive sentences of 320 months for the homicide by abuse and 123 months for the assault of I.W.

(State Court Rec. (Dkt. # 15-1), Ex. 4 at 2-3 (footnotes omitted).)

Petitioner identified the following nine assignments of error in her opening brief on appeal:

1.   The State failed to prove H.W. was under sixteen years of age, an essential element of the offense of homicide by abuse.

2.   The State failed to prove that I.W. suffered substantial bodily harm, an essential element of the offense of first degree assault of a child.

3.   The court erred in refusing to grant a mistrial based upon the State's misconduct.

4.   The court denied Ms. Williams the right to present a defense when it refused to allow the testimony of Dr. Bartelink, a critical defense witness.

5.   The prosecutor committed prejudicial misconduct during closing argument.

REPORT AND RECOMMENDATION
PAGE - 5

6.  The terms "extreme indifference to human life" and "torture" as they were used in the homicide by abuse and first degree assault of a child statutes are unconstitutionally vague as applied to Ms. Williams.

7.  The trial court erred in refusing to define the term "extreme indifference to human life" as expressed in Ms. Williams' Proposed Instruction 4C.

8.  The trial court erred in allowing expert testimony on torture where the term is a matter of common understanding.

9.  Cumulative error rendered Ms. Williams' trial unconstitutionally unfair.

(State Court Rec. (Dkt. # 15-1), Ex. 5 at 2-3.)

Petitioner identified the following three supplemental assignments of error in her reply brief on direct appeal:

1.  Ms. Williams' and the public's rights to an open trial were violated when a portion of the for-cause challenges and rulings were made at sidebar.

2.  Ms. Williams' and the public's rights to an open trial were violated when peremptory strikes were made on paper, outside the public specter.

3.  Ms. Williams' constitutional right to be present under the Sixth Amendment, the Due Process Clause and article I, section 22 was violated when the court conducted for-cause challenges at sidebar.

(State Court Rec. (Dkt. # 15-1), Ex. 6 at 1.)

On December 21, 2015, the Washington Court of Appeals issued an unpublished opinion affirming Petitioner's convictions, concluding that Petitioner's "assignments of error on appeal all lack merit." (State Court Rec. (Dkt. # 15-1), Ex. 3 at 1-2.)

Petitioner next sought review in the Washington Supreme Court. Petitioner identified the following six issues in her petition for review:

1.  The exclusion of Dr. Bartelink's testimony infringed Ms. Williams' right to present a defense.

2.  The only remedy that could cleanse the taint from the State's conduct involving Wondetsidik (sic) was a mistrial.

REPORT AND RECOMMENDATION
PAGE - 6

3.  The prosecutor's misconduct during closing argument violated Ms. Williams' right to a fair trial.

4.  The term "torture" was void for vagueness as applied to Ms. Williams' actions.

5.  In light of Court of Appeals decision deeming the term "torture" to be a term of normal understanding, the court erred in allowing expert testimony regarding this element.

6.  The State failed to prove Ms. Williams was guilty of homicide by abuse or first degree assault of a child.

    a.  *The State failed to prove H.W. was under the age of 16 years, an essential element of the offense of homicide by abuse.*

    b.  *The State failed to prove I.W. suffered substantial bodily harm, an essential element of the offense of first degree assault of a child.*

(State Court Rec. (Dkt. # 15-1), Ex. 9 at i-ii.) The Supreme Court denied review without comment on June 29, 2016, and the Washington Court of Appeals issued a mandate terminating direct review on October 7, 2016. (*Id.*, Exs. 10-11.)

On September 26, 2017, Petitioner, through counsel, filed a personal restraint petition in the Washington Court of Appeals. (State Court Rec. (Dkt. # 15-1), Ex. 12.). Petitioner identified therein the following grounds for relief:

A.  There was insufficient evidence to prove the element of extreme indifference to human life, because there was no evidence presented to show that Carri Williams did not care whether H.W. lived or died. Therefore, Petitioner's conviction for Homicide by Abuse violates her federal constitutional right under the 14th Amendment Due Process Clause to proof beyond a reasonable doubt.

B.  The prosecutor's blatant misstatement of the evidence in closing argument – accusing Carri Williams of delaying for ten or fifteen minutes before bringing her daughter into the house and summoning medical aid for her – when in fact the evidence at trial was that it took only a few seconds for

REPORT AND RECOMMENDATION
PAGE - 7

her to do that, deprived Williams of a fair trial in violation of the Due Process Clause of the 14th Amendment.

C.   The prosecutor's misstatement of the law in closing argument deprived Williams of a fair trial in violation of the Due Process Clause of the 14th Amendment. Contrary to the jury instructions and contrary to the Amended Information, the prosecutor told the jury that it could find the element of extreme indifference to human life by looking at how the Williamses treated [H.W.] over a period of several years. Trial counsel's failure to object to the prosecutor's misstatement of the law deprived Carri Williams of her 6th Amendment right to effective assistance of counsel.

D.   There was insufficient evidence to prove the recklessness component of the element of extreme indifference to human life, because there was no evidence presented to show that Carri Williams knew that she was creating a risk of death from hypothermia. Knowledge of the risk of death is required because recklessness requires proof of the conscious disregard of a substantial risk. Therefore, Petitioner's conviction for Homicide by Abuse violates her federal constitutional right under the 14th Amendment Due Process Clause to proof beyond a reasonable doubt of each and every element of the crime.

E.   Alternatively, if the crime of Homicide by Abuse does *not* require proof of knowledge of the risk of death, then the statute violates due process and no person of ordinary intelligence would know that one need not know a fact in order to be extremely indifferent to it. Such a construction of the statute would violate due process by punishing non-negligent conduct more harshly than reckless conduct, contrary to the Criminal Code.

F.   There was insufficient evidence to prove the element of recklessness as required for a conviction for Manslaughter 1° because there was no evidence presented to show that Carri Williams "knew of" and disregarded a substantial risk that [H.W.] could die from hypothermia. Petitioner's conviction for Manslaughter 1° violated her federal constitutional right under the 14th Amendment Due Process Clause to proof beyond a reasonable doubt of every element of the crime.

G(1).   Petitioner was denied her 6th and 14th Amendment rights to effective representation of counsel on appeal by her appellate counsel's failure to argue that the trial judge erred by failing to give a jury instruction which defined the term "extreme indifference to human life."

G(2).   Petitioner was denied her art. 4, § 16 right to have the trial judge declare the law by the trial judge's refusal to define the mens rea element of "extreme indifference to human life."

REPORT AND RECOMMENDATION
PAGE - 8

H.   Petitioner was denied her 6th Amendment constitutional right to effective assistance of counsel when her trial counsel failed to make a pretrial motion for severance of the trial of the two counts pertaining to the death of [H.W.] from the one count pertaining to the alleged assault against [I.W.].

I.   Petitioner was denied her 1st, 6th and 14th Amendment right to effective representation of counsel by both her trial attorneys' failure and her appellate attorney's failure to object to the introduction of evidence regarding the content of a book found in the Petitioner's house.

J.   Petitioner was denied her 14th Amendment right to due process because the Homicide-by-Abuse statute is facially unconstitutional under the void for vagueness doctrine. The statute violates substantive due process by infringing on the rights of parents to discipline their children without knowing what disciplinary conduct will violate the statute.

K.   Petitioner was denied her 6th and 14th Amendment rights to effective representation of counsel on appeal by her appellate counsel's failure to argue that the testimony of the expert witnesses as to what constitutes torture should have been excluded because this testimony usurped the role of the trial judge and violated the command of Article IV, Section 16 that the trial judge "shall declare the law."

L.   Carri Williams was denied her Sixth and Fourteenth Amendment right to effective representation of both trial and appellate counsel, by her attorneys' failure to argue that allowing the State's experts to testify that in their opinion she tortured her children violated Carri's 6th Amendment right to jury trial by permitting a witness to opine as to the guilt of a defendant.

(*Id.*, Ex. 12 at 16-18.) On November 25, 2019, the Washington Court of Appeals issued an unpublished opinion denying Petitioner's personal restraint petition. (*Id.*, Ex. 4.)

Petitioner thereafter filed a motion for discretionary review in which she identified the following issues for review:

1.   Is "extreme indifference to human life" a technical term of art within the ambit of the rule of *State v. Allen* that when requested a trial court must provide the jury with an instruction that defines it?

REPORT AND RECOMMENDATION
PAGE - 9

2.      Did appellate counsel's failure to raise the instructional issue in direct appeal constitute ineffective assistance of counsel?

3.      Does leaving it up to the jury to "hammer out" the correct definition of the *mens rea* element of a crime deny the accused her right under Wash. Const., art. IV, §16 to have the court declare the law?

4.      In order to do an act with extreme recklessness towards human life must a person be aware of the fact that his act creates a risk of causing death?

5.      Is the Homicide By Child Abuse statute void for vagueness?

(State Court Rec. (Dkt. # 15-1), Ex. 15 at 9.)

After setting forth the five specific issues identified above, Petitioner stated as follows:

For purposes of complying with the federal habeas corpus rule which requires the exhaustion of available state remedies, Williams presents this Court with the opportunity to decide the additional issues and claims set forth in Appendix F. She acknowledges, however, that these issues may not clearly meet the RAP 13.4(b) criteria for discretionary review.

(State Court Rec. (Dkt. # 15-1), Ex. 15 at 9-10.) Appendix F to the motion for discretionary review identified ten additional claims for review which included reference to federal law and citations to the briefing submitted to the Washington Court of Appeals by both Petitioner and by her co-defendant, Larry Williams. (*Id.*, Ex. 15, App. F.)

The Washington Supreme Court denied Petitioner's motion for discretionary review without comment on September 9, 2020, and the Washington Court of Appeals issued a mandate terminating Petitioner's personal restraint proceeding on February 26, 2021. (State Court Rec. (Dkt. # 15-2), Exs. 18-19.) Petitioner now seeks federal habeas review of her state court convictions.

### III.    GROUNDS FOR RELIEF

Petitioner identifies the following seven grounds for relief in her federal habeas petition:

REPORT AND RECOMMENDATION
PAGE - 10

1.     Petitioner was denied her Sixth Amendment right to present a defense by the trial court's order which precluded Dr. Eric Bartelink from testifying as a defense witness at the trial.

2.     Petitioner was denied her Sixth Amendment right to effective assistance of counsel. Her trial counsel's conduct was both deficient and prejudicial and thus satisfies the test of *Strickland v. Washington*, 466 U.S. 668 (1984). Her trial counsel's deficient acts include (a) failure to move for a severance of counts; (b) failure to object, to move to strike, or to move for mistrial, thereby allowing the admission and consideration of evidence of the content of a book on raising children which was found in Williams' possession, and which Williams was cross-examined about at length; (c) failure to object, on Sixth Amendment right to trial by jury grounds, to the testimony of prosecution witness that, in their opinion, Williams' conduct constituted "torture."

3.     Petitioner was denied her Fourteenth Amendment due process right to proof beyond a reasonable doubt of every element of the offense charged due to the insufficiency of the evidence of "extreme indifference to life," which is one of the elements of the crime of Homicide by Abuse.

4.     Petitioner was denied her Fourteenth Amendment due process right to proof beyond a reasonable doubt of every element of the offense charged due to the insufficiency of the evidence to prove that the victim was under 16 years of age, which is one of the elements of the crime of Homicide by Abuse.

5.     Petitioner was denied her Fourteenth Amendment right to due process because the statutory offense of Homicide by Abuse is void for vagueness, both facially, and as applied to Petitioner's conduct.

6.     Petitioner was denied her Fourteenth Amendment right to substantive due process because the statute at issue, Homicide by Abuse, infringes upon the constitutional right to raise children without providing notice of what type of conduct violates the statute.

7.     Petitioner was denied her Fourteenth Amendment due process right to a fair trial by prosecutorial misconduct when the prosecutor misstated the evidence in his closing argument by erroneously stating that the evidence showed that Williams delayed for ten to fifteen minutes before calling 911 to summon medical aid for her child.

(Petition at 6-7.)

REPORT AND RECOMMENDATION
PAGE - 11

## IV.     DISCUSSION

Respondent asserts that Petitioner properly exhausted some, but not all, of her seven grounds for federal habeas relief. (Answer at 11.) Specifically, Respondent concedes that Petitioner has exhausted available state court remedies with respect to her first, fourth, fifth, and sixth grounds for relief by fairly presenting those grounds as federal claims to both the Washington Court of Appeals and the Washington Supreme Court for review. (*Id*.) Respondent argues, however, that Petitioner failed to exhaust her available state court remedies with respect to her second, third, and seventh grounds for relief because she failed to properly present those claims to the Washington Supreme Court. (*Id*. at 11, 20-25.) Respondent further argues that Petitioner's unexhausted claims are now procedurally barred and are not cognizable in this federal habeas proceeding. (*Id*. at 11, 25.) Finally, Respondent argues that Petitioner is not entitled to relief in this federal habeas action with respect to any of her exhausted claims because the Court of Appeals reasonably rejected those claims. (*See id*. at 25-43.)

### A.     Exhaustion and Procedural Default

The Court begins by addressing Respondent's argument that some of Petitioner's claims have not been properly exhausted, and are therefore, not eligible for review in this federal habeas action. A state prisoner is required to exhaust all available state court remedies before seeking a federal writ of habeas corpus. 28 U.S.C. § 2254(b)(1). The exhaustion requirement is a matter of comity, intended to afford the state courts "an initial opportunity to pass upon and correct alleged violations of its prisoners' federal rights." *Picard v. Connor*, 404 U.S. 270, 275 (1971) (internal quotation marks and citations omitted). In order to provide the state courts with the requisite "opportunity" to consider her federal claims, a prisoner must "fairly present" her claims to each appropriate state court for review, including a state supreme court with powers of discretionary

REPORT AND RECOMMENDATION
PAGE - 12

review. *Baldwin v. Reese*, 541 U.S. 27, 29 (2004) (citing *Duncan v. Henry*, 513 U.S. 364, 365 (1995), and *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999)).

"In order to 'fairly present' an issue to a state court, a petitioner must 'present the substance of [her] claim to the state courts, including a reference to a federal constitutional guarantee and a statement of facts that entitle the petitioner to relief.'" *Gulbrandson v. Ryan*, 738 F.3d 976, 992 (9th Cir. 2013) (quoting *Scott v. Schriro*, 567 F.3d 573, 582 (9th Cir. 2009)); *see also Picard*, 404 U.S. at 275-78 (1971) (proper exhaustion requires a petitioner to have "fairly presented" to the state courts the exact federal claim she raises on habeas by describing the operative facts and federal legal theory on which the claim is based). Claims that are based on the same facts must be separately exhausted if they are supported by distinct constitutional theories. *See Gray v. Netherland*, 518 U.S. 152, 162-63 (1996).

General appeals to broad constitutional principles such as due process and the right to a fair trial are insufficient to establish exhaustion. *Hiivala v. Wood*, 195 F.3d 1098, 1106 (9th Cir. 1999). "If a petitioner fails to alert the state court to the fact that [s]he is raising a federal constitutional claim, h[er] federal claim is unexhausted regardless of its similarity to the issues raised in state court." *Johnson v. Zenon*, 88 F.3d 828, 830 (9th Cir. 1996). A habeas petitioner who fails to meet a state's procedural requirements for presenting her federal claims deprives the state courts of the opportunity to address those claims in the first instance. *See Coleman v. Thompson*, 501 U.S. 722, 732 (1991).

At issue here are Petitioner's second, third, and seventh grounds for federal habeas relief. Respondent, in her answer to the petition, asserts that Petitioner failed to fairly present one of the three components of her second ground for relief, alleging ineffective assistance of trial counsel, to the Washington Court of Appeals. (Answer at 20.) Respondent argues, however, that even

REPORT AND RECOMMENDATION
PAGE - 13

assuming each of the three grounds identified above were properly presented to the Court of Appeals as federal claims, Petitioner failed to properly exhaust available state remedies because she did not present the claims within the four corners of her motion for discretionary review in the Washington Supreme Court, but instead attempted to merely incorporate them by reference. (*Id.*) Petitioner, in her response to Respondent's answer, presents no argument in opposition to Respondent's exhaustion argument, suggesting that she is conceding the referenced claims have not been properly exhausted. (*See* Pet.'s Resp.) The Court will nonetheless briefly address the substance of Respondent's exhaustion argument given that Petitioner represents in her petition that she properly exhausted each of her seven claims for relief. (*See* Petition at 7, ¶ 6.1.)

Petitioner alleges in the third component of her second ground for federal habeas relief that her trial counsel rendered ineffective assistance by failing to object, on Sixth Amendment right to trial by jury grounds, to the testimony of prosecution witnesses that Petitioner's conduct constituted "torture." (*See* Petition at 6, ¶ 5.2.) Respondent asserts that Petitioner failed to fairly present this component of her ineffective assistance of counsel claim to the Washington Court of Appeals because, though Petitioner mentioned this part of her claim in her personal restraint petition, she did not present any argument in support of the claim. (Answer at 20.)

Respondent is correct that Petitioner did not present any argument with respect to this component of her ineffective assistance of counsel claim in her personal restraint petition, referring instead to her co-defendant's personal restraint petition in an attempt to incorporate into her petition all claims asserted in Larry Williams's petition. (*See* State Court Rec. (Dkt. # 15-1), Ex. 12 at 99.) The Court observes, however, that the claim presented by Petitioner in her personal restraint petition was not even the same claim as that presented in the third component of her second ground for federal habeas relief. The claim identified in Petitioner's personal

REPORT AND RECOMMENDATION
PAGE - 14

restraint petition was that she was denied her right to effective representation *on appeal* when her appellate counsel failed to argue that the testimony of the expert witnesses as to what constitutes torture should have been excluded because the testimony usurped the role of the trial judge. (*Id.*, Ex. 12 at 18.) Petitioner's federal habeas claim specifically alleges an ineffective assistance of *trial* counsel claim based upon counsel's failure to object to the testimony of the expert witnesses. (*See* Petition at 6, ¶ 5.2.) It is therefore clear that the third component of Petitioner's second ground for federal habeas relief was not fairly presented to the Washington Court of Appeals.

The Court now turns to Respondent's argument that Petitioner failed to exhaust her state court remedies with respect to her second, third, and seventh grounds for relief because she failed to properly present those claims to the Washington Supreme Court. Proper exhaustion requires that a claim be presented at each level of review under the same legal theory and based on the same operative facts. Petitioner, in her motion for discretionary review, specifically identified five issues for review which did not include the three claims at issue here. (*See* State Court Rec. (Dkt. # 15-1), Ex. 15 at 9.) Petitioner then advised the court that for purposes of complying with the federal habeas rules regarding exhaustion, she was presenting the court with "the opportunity to decide the additional issues and claims set forth in Appendix F." (*Id.*, Ex. 15 at 9-10.) Appendix F to Petitioner's motion for discretionary review contains a list of ten additional claims with citations to her personal restraint petition and other documents that were before the Washington Court of Appeals in her personal restraint proceedings and in those of her co-defendant. (*Id.*, Ex. 15, App. F.)

In *Baldwin*, 541 U.S. at 30-32, the Supreme Court observed that federal habeas corpus law does not require a state court judge to read through lower court opinions or briefing to

REPORT AND RECOMMENDATION
PAGE - 15

discover the existence of a federal claim. "[O]rdinarily a state prisoner does not 'fairly present' a claim to a state court if that court must read beyond a petition or a brief (or a similar document) that does not alert it to the presence of a federal claim in order to find material, such as a lower court opinion in the case, that does so." *Id*.

In some circumstances, incorporation by reference of a prior court document may satisfy the exhaustion requirement. In *Insyxiengmay v. Morgan*, 403 F.3d 657, 668 (9th Cir. 2005) (internal citations omitted), the Ninth Circuit explained that fair and full presentation satisfying exhaustion occurs with presentation of a federal constitutional claim "(1) to the proper forum, (2) through the proper vehicle, and (3) by providing the proper factual and legal basis for the claim[.]" In *Insyxiengmay*, the petitioner presented to the state supreme court three federal constitutional claims in an appendix consisting of a full copy of his personal restraint petition, and devoted the body of his motion for discretionary review to the state appellate court's dismissal on the grounds of timeliness. *Id*. Noting that the appendix contained the arguments as to the constitutional claims, the court found clear presentation of those claims as federal issues to the state supreme court. The court distinguished cases involving arguments relying on documents never presented to the higher court. *Id*. at 668-69. *Insyxiengmay*, in the appendix filed in the state supreme court, "presented extensive argument in support of all three claims as well as citations to the requisite authority and to relevant parts of the record." *Id*. at 669.

This Court has found exhaustion where a petitioner's motion seeking discretionary review identifies an issue for review and attaches briefs or other documents to the petition that contain the arguments in support of the issue. *See, e.g.*, *Silva v. Holbrook*, 2016 WL 8235139 at *6 (W.D. Wash. Nov. 2, 2016), *adopted*, 2017 WL 568822 (W.D. Wash. Feb. 13, 2017) (in motion for discretionary review petitioner asserted entitlement to discharge based on "sixteen

REPORT AND RECOMMENDATION
PAGE - 16

(16) discrete issues raised in the operative pleadings herein[,]" and attached copies of his

personal restraint petition and supplemental petition); *Miller v. Quinn*, 2009 WL 117985 at *1

(9th Cir. Jan. 9, 2009) (finding exhaustion where petition identified a claim, but did not refer to

federal constitutional issues, but relevant law addressing federal constitutional issues was

discussed extensively in attachments to petition). This case is distinguishable from

*Insyxiengmay*, and the other cases cited herein, because Petitioner merely listed her claims in the

appendix to her motion for discretionary review and did not attach to the appendix the

documents referenced therein that contained the argument in support of the listed claims.

Accordingly, the three claims at issue in this case, which were merely identified, but not argued,

in an attachment to Petitioner's motion for discretionary review, have not been properly

exhausted.

When a petitioner fails to exhaust her state court remedies and the court to which the

petitioner would be required to present her claims in order to satisfy the exhaustion requirement

would now find the claims to be procedurally barred, there is a procedural default for purposes of

federal habeas review. *Coleman*, 501 U.S. at 735 n.1. Respondent argues that Petitioner, having

failed to properly exhaust the claims discussed above, would now be barred from presenting

those claims to the state courts under RCW 10.73.090. (Answer at 24.)

RCW 10.73.090(1) provides that a petition for collateral attack on a judgment and

sentence in a criminal case must be filed within one year after the judgment becomes final.

Petitioner's judgment became final for purposes of state law on October 7, 2016, the date the

Washington Court of Appeals issued its mandate terminating direct review. *See* RCW

10.73.090(3)(b). It therefore appears clear that Petitioner would now be time barred from

returning to the state courts to present her unexhausted claims. *See* RCW 10.73.090. As a result,

REPORT AND RECOMMENDATION
PAGE - 17

this Court concludes that Petitioner has procedurally defaulted on her second, third, and seventh grounds for federal habeas relief.

When a state prisoner defaults on her federal claims in state court, pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law or can demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice. *Coleman*, 501 U.S. at 750. To satisfy the "cause" prong of the cause and prejudice standard, a petitioner must show that some objective factor external to the defense prevented her from complying with the state's procedural rule. *Id*. at 753 (citing *Murray v. Carrier*, 477 U.S. 478, 488 (1986)). To show "prejudice," a petitioner "must shoulder the burden of showing, not merely that the errors at her trial created a *possibility* of prejudice, but that they worked to her *actual* and substantial disadvantage, infecting her entire trial with error of constitutional dimensions." *United States v. Frady*, 456 U.S. 152, 170 (1982) (emphasis in original). Only in an "extraordinary case" may the habeas court grant the writ without a showing of cause or prejudice to correct a "fundamental miscarriage of justice" where a constitutional violation has resulted in the conviction of a defendant who is actually innocent. *Murray*, 477 U.S. at 495-96.

Petitioner makes no effort to show cause or prejudice for her default, nor does she make any showing that failure to consider her defaulted claims will result in a fundamental miscarriage of justice. Petitioner therefore fails to demonstrate that her unexhausted claims are eligible for federal habeas review. Accordingly, Petitioner's federal habeas petition should be denied with respect to her second, third, and seventh grounds for relief.

**B.     Section 2254 Merits Review**

*1.     Federal Habeas Standard, 28 U.S.C. § 2254*

Under the Anti-Terrorism and Effective Death Penalty Act ("AEDPA"), a habeas corpus petition may be granted with respect to any claim adjudicated on the merits in state court only if (1) the state court's decision was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the United States Supreme Court, or (2) the decision was based on an unreasonable determination of the facts in light of the evidence presented. 28 U.S.C. § 2254(d). In considering claims pursuant to § 2254(d), the Court is limited to the record before the state court that adjudicated the claim on the merits, and the petitioner carries the burden of proof. *Cullen v. Pinholster*, 563 U.S. 170, 181-82 (2011).

Under § 2254(d)(1)'s "contrary to" clause, a federal court may grant the habeas petition only if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law, or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. *See Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). Under the "unreasonable application" clause, a federal habeas court may grant the writ only if the state court identifies the correct governing legal principle from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the prisoner's case. *See id*. at 407-09.

The Supreme Court has made clear that a state court's decision may be overturned only if the application is "objectively unreasonable." *Lockyer v. Andrade*, 538 U.S. 63, 75-76 (2003). The Supreme Court has further explained that "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the

REPORT AND RECOMMENDATION
PAGE - 19

correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).

Clearly established federal law, for purposes of AEDPA, means "the governing legal principle or principles set forth by the Supreme Court at the time the state court render[ed] its decision." *Lockyer*, 538 U.S. at 71-72. This includes the Supreme Court's holdings, not its dicta. *Id.* at 71. "If no Supreme Court precedent creates clearly established federal law relating to the legal issue the habeas petitioner raised in state court, the state court's decision cannot be contrary to or an unreasonable application of clearly established federal law." *Brewer v. Hall*, 378 F.3d 952, 955 (9th Cir. 2004) (citing *Dows v. Wood*, 211 F.3d 480, 485-86 (9th Cir. 2000)).

Under § 2254(d)(2), a petitioner may only obtain relief by showing that the state court's conclusion was based on "an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." "To show such an error occurred, the petitioner must establish that the state court's decision rested on a finding of fact that is '*objectively unreasonable.*'" *Hibbler v. Benedetti*, 693 F.3d 1140, 1146 (9th Cir. 2012) (quoting *Lambert v. Blodgett*, 393 F.3d 943, 972 (9th Cir. 2004)) (emphasis in original). "Factual findings are objectively unreasonable if they are unsupported by sufficient evidence in the state court record." *Tong Xiong v. Felker*, 681 F.3d 1067, 1074 (9th Cir. 2012). In addition, the Court presumes the state court's factual findings to be sound unless the petitioner rebuts "the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

### 2. Ground One - Right to Present a Defense

Petitioner asserts in her first ground for relief that she was denied her Sixth Amendment right to present a defense by the trial court's order precluding Dr. Eric Bartelink from testifying as a defense witness at trial. (Petition at 6, ¶ 5.1) Dr. Bartelink is an anthropologist who, at the

REPORT AND RECOMMENDATION
PAGE - 20

request of Petitioner's co-defendant, had radiocarbon testing conducted on two of H.W.'s teeth for purposes of determining her age. (*See* State Court Rec. (Dkt. # 15-1), Ex. 5 at 9.) The age of the victim at the time of her death was a contested issue at trial.

"[T]he Constitution guarantees defendants 'a meaningful opportunity to present a complete defense.'" *Crane v. Kentucky*, 476 U.S. 683, 690 (1986) (quoting *California v. Trombetta*, 467 U.S. 479, 485 (1984)) (internal citations omitted). Criminal defendants have the right "to present and have considered by the jury all relevant evidence to rebut the State's evidence on all elements of the offense charged." *Montana v. Egelhoff*, 518 U.S. 37, 41-42 (1996). "Few rights are more fundamental than that of an accused to present witnesses in his own defense[.]" *Taylor v. Illinois*, 484 U.S. 400, 408 (1988). However, "[t]he accused does not have an unfettered right to offer testimony that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence." *Id*. at 410.

In *Taylor*, the Supreme Court held that the Compulsory Process Clause of the Sixth Amendment does not create an absolute bar to the imposition of a discovery sanction that entirely excludes the testimony of a material defense witness. *Taylor*, 484 U.S. at 414-16. *Taylor* makes clear that while "a trial court may not ignore the fundamental character of the defendant's right to offer testimony of witnesses in his favor," that right does not "automatically and invariably outweigh countervailing public interests." *Id*. at 414. The right must therefore be weighed against "[t]he integrity of the adversary process, which depends both on the presentation of reliable evidence and the rejection of unreliable evidence, the interest in the fair and efficient administration of justice, and the potential prejudice to the truth-determining function of the trial process." *Id*. at 414-15.

REPORT AND RECOMMENDATION
PAGE - 21

1    The *Taylor* Court declined to "draft a comprehensive set of standards to guide the [trial

2  court's] exercise of discretion in every possible case." *Taylor*, 484 U.S. at 414. In a footnote,

3  however, the *Taylor* Court cited as an example of the factors to be considered in undertaking the

4  requisite balancing those identified by the Ninth Circuit in *Fendler v. Goldsmith*, 728 F.2d 1181,

5  1188-90 (9th Cir. 1983), which include "the effectiveness of less severe sanctions, the impact of

6  preclusion on the evidence at trial and the outcome of the case, the extent of prosecutorial

7  surprise or prejudice, and whether the violation was willful." *Id*. at 415 n.19.

8    On direct appeal, Petitioner asserted that the exclusion of Dr. Bartelink as a remedy for a

9  discovery violation impermissibly infringed on her constitutional right to present a defense.

10  (State Court Rec. (Dkt. # 15-1), Ex. 5 at 22-30.) Petitioner argued in support of this claim that

11  the trial court failed to establish that exclusion of the evidence was warranted under Washington

12  Superior Court Criminal Rule ("CrR") 4.7 as a sanction for a discovery violation, *i.e.*, giving late

13  notice that Dr. Bartelink would be a witness for the defense at trial. (*Id*., Ex. 5 at 24-28.)

14  Petitioner went on to argue that the error in refusing to allow Dr. Bartelink's testimony was not

15  harmless. (*Id*., Ex. 5 at 29-30.)

16    The Washington Court of Appeals construed the claim as one arguing that the trial court

17  abused its discretion when it excluded Dr. Bartelink's testimony as a discovery sanction. (State

18  Court Rec. (Dkt. # 15-1), Ex. 3 at 8.) The court rejected the claim, reasoning as follows:

19      We review a trial court's decision to exclude evidence for abuse of
      discretion. A trial court abuses its discretion when its decision is manifestly

20    unreasonable or based upon untenable grounds or untenable reasons.

21      CrR 4.7 governs discovery in criminal cases and "defines the discovery
      obligations of both the prosecution and defense." A defendant has "a continuing

22    obligation" to promptly disclose the names and addresses of intended witnesses
      and the substance of their testimony "no later than the omnibus hearing." To

23    enforce CrR 4.7, a trial court is given "wide discretion in ruling on discovery

REPORT AND RECOMMENDATION
PAGE - 22

violations." CrR 4.7(h)(7) lists sanctions for a party's failure to comply with any discovery rule. The trial court may "grant a continuance, dismiss the action and enter such other order as it deems just under the circumstances." Our Supreme Court in State v. Hutchinson interpreted CrR 4.7(h)(7) to permit "exclusion of defense witness testimony as a sanction for discovery violations." But exclusion of evidence is "an extraordinary remedy" that "should be applied narrowly."

The Hutchinson court identified four factors that a trial court should consider in determining whether to exclude evidence as a discovery sanction: "(1) the effectiveness of less severe sanctions; (2) the impact of witness preclusion on the evidence at trial and the outcome of the case; (3) the extent to which the prosecution will be surprised or prejudiced by the witness's testimony; and (4) whether the violation was willful or in bad faith." Although the trial court here did not expressly apply the four factors in excluding Dr. Bartelink's testimony, the State and the defense briefed those factors at trial. The lack of express findings regarding the four factors does not preclude us from evaluating those factors based on the record developed at trial.

Many months before trial, the parties knew that H.W.'s age was a contested issue. The parties discussed the potential for various tests to estimate H.W.'s age, including the use of radiocarbon dating of teeth. In January 2013, six months before trial, the trial court authorized Dr. Bartelink to assess H.W.'s teeth in order to estimate her age. It appears Larry listed Dr. Bartelink as a potential witness but then removed him from the witness list. Mid-trial, after the State disclosed that H.W.'s cousin would travel from Ethiopia to testify to H.W.'s birth date, Larry asked Dr. Bartelink to arrange for radiocarbon dating of H.W.'s teeth.[2] When Larry received the results of those tests and Dr. Bartelink's report, he advised the State and asked the court to supplement the witness list.

The trial court initially permitted Dr. Bartelink to testify despite the late disclosure. The court focused upon the defense's reasonable need to respond to the cousin's testimony of a specific birth date and upon counsel's representation that Dr. Bartelink would conclude it was scientifically impossible for H.W. to be 13 or 14 years of age at the time of her death. But once the court struck the cousin's testimony, the court granted the State's motion to exclude Dr. Bartelink's testimony as a discovery sanction for late disclosure. The court determined that the defense no longer needed to rebut the cousin's testimony and that Dr. Bartelink's testimony would not exclude H.W. from being under 16 years of age.

---

[2] This sentence is somewhat inaccurate. The record indicates that the State's disclosure regarding H.W.'s cousin, and Larry's request that Dr. Bartelink arrange for radiocarbon dating of H.W.'s teeth, occurred prior to trial. (See State Court Rec. (Dkt. # 15-2), Ex. 21 at 60-63, 71-74.) However, Larry Williams's counsel did not disclose that the testing had actually been done, or seek to add Dr. Bartelink as a witness, until mid-trial. (See id., Ex. 21 at 55-75.)

REPORT AND RECOMMENDATION
PAGE - 23

The issue here is whether excluding Dr. Bartelink's testimony was the proper remedy under the circumstances.

Less severe sanctions. A party's failure to identify witnesses in a timely manner is "appropriately remedied by continuing trial to give the nonviolating party time to interview a new witness or prepare to address new evidence." The defense disclosed Dr. Bartelink as a witness mid-trial, but the State knew about Dr. Bartelink's testing methods as early as December 2012. The State objected that there was inadequate time to prepare to interview and cross-examine Dr. Bartelink on the technical area of radiocarbon dating of teeth. Although it is not clear from the record why a continuance was an inadequate remedy, the trial court is best situated to analyze the extent of the delay that would be required to adequately prepare to cross-examine Dr. Bartelink. At most, this factor mildly weighs against exclusion.

Impact of witness preclusion. The impact of precluding Dr. Bartelink's testimony that H.W. was 15 years of age or older was not significant and did not undermine Carri's defense. Dr. Bartelink alone used the radiocarbon testing method when he estimated with "95% confidence" H.W.'s minimum age at death to be 15.6 years. But his ultimate conclusion that H.W. was between 15 and 20 years of age is cumulative to the age ranges testified to by the other experts at trial. When the trial court excluded Dr. Bartelink's testimony, it had already struck H.W.'s cousin's testimony that H.W. was born on a specific date and had instructed the jury to disregard the cousin's testimony. The defense no longer needed to rebut that testimony. This factor weighs in favor of exclusion.

Surprise or prejudice. The State knew about the potential for radiocarbon testing in January 2013, sixth months before trial, when Dr. Bartelink received the teeth. The State did not know the results of the testing until mid-trial, but the State was able to interview Dr. Bartelink shortly after receiving his report. Although the trial court is best situated to evaluate the level of surprise or prejudice from the late disclosure of a witness, the extent of any surprise to the State here was limited.

Willfullness and bad faith. Larry did not seek to conduct radiocarbon testing of H.W.'s teeth until several months after Dr. Bartelink received them. That delay was intentional and not inadvertent or the result of miscommunication. Carri did not disclose Dr. Bartelink as a potential witness until the August 13, 2013 hearing and never supplemented her witness list to include Dr. Bartelink. Her decision not to list Dr. Bartelink as a witness was also intentional conduct. This factor weighs in favor of exclusion.

On this record, with at most two factors supporting exclusion and two factors opposing exclusion, we conclude the trial court acted within its wide discretion in excluding Dr. Bartelink's testimony.

REPORT AND RECOMMENDATION
PAGE - 24

(State Court Rec. (Dkt. # 15-1), Ex. 3 at 8-12 (citations omitted).)

Petitioner presents numerous arguments in her response to Respondent's answer pertaining to the Washington Court of Appeals' rejection of her Sixth Amendment claim, none of which have merit. Petitioner first argues that this Court should review her Sixth Amendment claim *de novo* because the Court of Appeals did not reference the Sixth Amendment or cite to *Taylor* in addressing her claim regarding the exclusion of Dr. Bartelink's testimony, analyzing it instead as solely an issue of state law. (Pet.'s Resp. at 35-36.) "When a state court rejects a federal claim without expressly addressing that claim, a federal habeas court must presume that the federal claim was adjudicated on the merits . . . ." *Johnson v. Williams*, 568 U.S. 289, 301 (2013); *see also id.* ("if the state-law rule subsumes the federal standard—that is, if it is at least as protective as the federal standard—then the federal claim may be regarded as having been adjudicated on the merits"). That presumption may be rebutted in limited circumstances, including when the state standard is less protective than the federal standard, the state and federal standards are quite different, or the petitioner merely mentioned the provision of the U.S. Constitution or federal precedent in passing in a footnote or in a string cite. *Id.* at 301-02 (although "presumption is a strong one that may be rebutted only in unusual circumstances, it is not irrebuttable").

The *Johnson* presumption applies in this case because Petitioner raised state and federal challenges to the exclusion of Dr. Bartelink's testimony in the state courts, but the Washington Court of Appeals did not expressly address the federal claim. While it is true that the Court of Appeals never mentions the Sixth Amendment or *Taylor* in its decision, relying instead on CrR 4.7(h)(7) and *State v. Hutchinson*, 135 Wn.2d 863, 881 (1988), Petitioner apparently overlooks the fact that the Washington Supreme Court, in *Hutchinson*, specifically "construe[d] CrR 4.7 in

REPORT AND RECOMMENDATION
PAGE - 25

light of the United States Supreme Court's decision in *Taylor v. Illinois*, which permits exclusion of defense witness testimony as a sanction for discovery violations." *Hutchinson*, 135 Wn.2d at 881.

The *Hutchinson* Court went on to identify the four factors the *Taylor* Court extracted from *Fendler* as "the factors to be considered in deciding whether to exclude evidence as a sanction." *Hutchinson*, 135 Wn.2d at 882-3 (citing *Taylor*, 484 U.S. at 415 n.19). The Washington Court of Appeals, in reviewing Petitioner's challenge to the trial court's exclusion of Dr. Bartelink's testimony, applied the factors set forth in *Hutchinson* and, by extension, those identified in *Taylor*. The fact that the Court of Appeals did not specifically cite to *Taylor* in its decision is inconsequential and application of AEDPA deference is appropriate in this case. *See Mitchell v. Esparza*, 540 U.S. 12, 16 (2003) (per curiam) ("We have held that a state court need not even be aware of our precedents, 'so long as neither the reasoning nor the result of the state-court decision contradicts them.'" (quoting *Early v. Packer*, 537 U.S. 3, 8 (2002)).

Petitioner next argues that even if AEDPA deference applies, she is entitled to federal habeas relief because the Washington Court of Appeals' decision was both contrary to, and constituted an unreasonable application of, clearly established United States Supreme Court precedent. (Pet.'s Resp. at 36-37.) Petitioner suggests that the relevant clearly established law applicable to the exclusion issue presented here is that set forth in *United States v. Finley*, 301 F.3d 1000 (9th Cir. 2002). (Pet.'s Resp. at 37.) In *Finley*, the Ninth Circuit stated that "[e]xclusion is an appropriate remedy for a discovery rule violation only where 'the omission was willful and motivated by a desire to obtain a tactical advantage.'" *Finley*, 301 F.3d at 1018 (citing *Taylor*, 484 U.S. at 415). Petitioner argues that since the trial judge stated on the record that she was not saying defense counsel had "unclean hands" related to the late disclosure, the

*Taylor* requirement that the discovery rule violation was motivated by a desire to obtain a tactical advantage is missing and, thus, the state court decision is contrary to the clearly established precedent of *Taylor*. (Pet.'s Resp. at 37.)

Petitioner's reliance on *Finley* is misplaced. The Supreme Court has repeatedly emphasized that circuit precedent does not constitute "clearly established Federal law, as determined by the Supreme Court." *Glebe v. Frost*, 574 U.S. 21, 24 (2014) (per curiam). The Supreme Court has also made clear that circuit precedent may not be "used to refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule that this Court has not announced." *Marshall v. Rodgers*, 569 U.S. 58, 64 (2013).

Respondent argues that *Finley* extends and sharpens *Taylor* to the extent it provides exclusion is warranted *only* when an omission was both willful *and* motivated by a desire to obtain a tactical advantage. (*See* Resp.'s Reply at 7.) While *Taylor* acknowledged that exclusion of a witness's testimony would be "consistent with the purposes of the Compulsory Process Clause" in a circumstance where "the omission was willful and motivated by a desire to obtain a tactical advantage that would minimize the effectiveness of cross-examination and the ability to adduce rebuttal evidence," *Taylor*, 484 U.S. at 415, the Court did not limit a trial court's authority to exclude testimony to such circumstances. The *Taylor* Court merely prescribed a balancing approach for trial courts in evaluating whether preclusion is an appropriate sanction for a discovery violation, and it identified factors relevant to the balancing process. The Court made clear, however, that it did not purport to "draft a comprehensive set of standards to guide the exercise of discretion in every possible case." *Id*. at 414.

Petitioner's attempt to incorporate a bad faith requirement into the *Taylor* balancing process based on the Ninth Circuit's decision in *Finley* is unavailing. Nothing in the *Taylor*

REPORT AND RECOMMENDATION
PAGE - 27

1  decision suggests that "bad faith" is an absolute requirement for exclusion, it is but one factor

2  which may be considered in the balancing process. *See United States v. Johnson*, 970 F.2d 907,

3  911 (D.C. Cir. 1992) ("We think any requirement of bad faith as an absolute condition to

4  exclusion would be inconsistent with the *Taylor* Court's reference to trial court discretion and its

5  extended discussion of the relevant factors. While the Court noted that the trial judge had found

6  that "the discovery violation in this case was both willful and blatant", 484 U.S. at 416, 108

7  S. Ct. at 657, the opinion certainly did not say such findings were essential. Accordingly, we

8  agree with those circuits that have treated bad faith as an important factor but not a prerequisite

9  to exclusion.").

10        Petitioner misidentifies the applicable law in arguing that the Washington Court of

11  Appeals' decision was contrary to *Taylor*. The Court of Appeals identified the appropriate

12  factors under *Taylor* and reasonably concluded that exclusion of Dr. Bartelink's testimony was

13  justified based upon its application of those factors. Thus, Petitioner is not entitled to relief under

14  § 2254(d)(1).

15        Petitioner next offers an alternative argument that even if she is not entitled to relief

16  under § 2254(d)(1), she is entitled to relief under § 2254(d)(2) because the fact-finding process

17  employed by the Washington Court of Appeals was inadequate and because the Court of

18  Appeals' decision was based on an unreasonable determination of the facts. (Pet.'s Resp. at

19  37-39.) As to the first part of this argument, Petitioner claims that the fact-finding process was

20  inadequate because the trial judge did not make any findings of fact related to the discovery

21  violation involving Dr. Bartelink's testimony, and the Court of Appeals proceeded to make

22  factual findings based on the trial record which, Petitioner argues, it was not permitted to do

23  under Washington law. (*Id*. at 37 (citing *Stringfellow v. Stringfellow*, 56 Wn.2d 957, 959 (1960)

REPORT AND RECOMMENDATION
PAGE - 28

("Factual disputes are to be resolved by the trial court. The Washington Constitution, by art. IV, § 6, vests power exclusively in the trial court.")).)

The United States Supreme Court has held that 28 U.S.C. § 2254(d) applies to factual determinations made by the state courts, whether the court be a trial court or an appellate court. *See Sumner v. Mata*, 449 U.S. 539, 546-47 (1981). While *Sumner* was a pre-AEDPA case, and therefore referred to § 2254(d) as formulated prior to the enactment of AEDPA, Petitioner identifies no authority holding that the AEDPA formulation of § 2254(d) is distinguishable from the pre-AEDPA formulation in the manner she suggests. Moreover, the Ninth Circuit has explained that AEDPA requires deference to state court findings, even when those findings are made by the appellate court. *Williams v. Johnson*, 840 F.3d 1006, 1011 (9th Cir. 2016) ("We do not review the state courts' last reasoned decision to ensure that it is consistent with the findings of the lower state courts; rather, we review the last reasoned decision to determine whether it reasonably determined the facts 'in light of the evidence presented in the State court proceeding.") Petitioner's contention that the fact-finding process employed by the Washington Court of Appeals was inadequate because the Court of Appeals, and not the trial court, made the relevant factual findings, is without merit.

As to the second part of Petitioner's argument, that the Washington Court of Appeals' decision was based on an unreasonable determination of the facts, Petitioner again misses the mark. Petitioner asserts that the appellate court's finding that her trial counsel engaged in willful misconduct designed to obtain a tactical advantage is contradicted by the record. (Pet.'s Resp. at 38-39.) Petitioner maintains that the trial judge explicitly rejected the suggestion that either Petitioner's counsel or counsel for her co-defendant had "unclean hands" in relation to Dr. Bartelink's proposed testimony, and that the Washington Court of Appeal's finding of fact that

REPORT AND RECOMMENDATION
PAGE - 29

there was a discovery rule violation "motivated by a desire to obtain a tactical advantage" is "indisputably utterly wrong." (*Id*. at 39.)

The record is clear that the trial court did not make any finding of "bad faith" or "unclean hands," and, indeed, expressly rejected that suggestion. (State Court Rec. (Dkt. # 16), Ex. 23 at 80-81.) Moreover, despite Petitioner's claim to the contrary, the Washington Court of Appeals never found that the late disclosure of Dr. Bartelink was done to gain a tactical advantage, *i.e.*, in bad faith. The Court of Appeals merely found that the delay in disclosing Dr. Bartelink as a witness was "intentional conduct," and "not inadvertent or the result of miscommunication." (*Id*. (Dkt. # 15-1), Ex. 3 at 12.) It is indisputable that the conduct of both Petitioner's trial counsel and co-defendant's trial counsel was intentional.

Dr. Bartelink was retained by co-defendant Larry Williams's counsel. At a hearing preceding the exhumation of H.W.'s body, Larry Williams's counsel requested that teeth be extracted from the corpse so that Dr. Bartelink could facilitate radiocarbon testing of the teeth for purposes of determining H.W.'s age at the time of her death. (*See* Lobsenz Decl., App. I; State Court Rec. (Dkt. # 15-2), Ex. 20 at 14-29, 51-52.) The teeth were extracted in January 2013, but Larry Williams's counsel did not request that Dr. Bartelink conduct the anticipated testing until June 8, 2013, and the testing did not actually occur until July 23, 2013. (State Court Rec. (Dkt. # 15-2), Ex. 21 at 56.) It was not until approximately mid-August, when trial was well underway, that Larry Williams's counsel advised the State and the trial court that the defense intended to call Dr. Bartelink as a witness. (*Id*. at 65.)

Larry Williams's counsel advised the trial court, during a hearing on the State's first motion to exclude Dr. Bartelink, that the defense decided to have the testing done the day after the parties participated in a status hearing during which co-defendant's counsel represented to

REPORT AND RECOMMENDATION

PAGE - 30

the State and the trial court that she was not expecting to present any other experts aside from one already proffered, who was not Dr. Bartelink. (State Court Rec. (Dkt. # 15-2), Ex. 21 at 56, 60-61.) Counsel acknowledged that the testing had been intentionally delayed because of uncertainty as to whether such testing would be necessary. (*Id.*, Ex. 21 at 60-62.)

During the same hearing, Petitioner's counsel acknowledged that Dr. Bartelink was not their witness but notified the State and the trial court that they would like to add Dr. Bartelink to their witness list. (State Court Rec. (Dkt. # 15-2), Ex. 21 at 67.) Petitioner's counsel further acknowledged that they had been unaware, until just a few days prior to the hearing, that Larry Williams's counsel "had done anything with the teeth." (*Id.*, Ex. 21 at 67-68.) Petitioner's counsel went on to note that they did not actually have any teeth extracted and it was only after they had been advised by Larry Williams's counsel a few days prior that "there was possibly a good result from Dr. Bartelink," and that Dr. Bartelink might be a witness. (*Id.*, Ex. 21 at 68.)

It is apparent from this record that Petitioner's counsel never had any intention of having the teeth tested and only sought to add Dr. Bartelink as a witness, mid-trial, after being advised by Larry Williams's counsel that Dr. Bartelink may be able to offer testimony helpful to the defense. While this does not suggest any bad faith on the part of Petitioner's counsel, it was unquestionably intentional, *i.e.*, willful. Moreover, as discussed above, neither clearly established law as determined by *Taylor*, nor state law as determined by *Hutchinson*, required a finding of bad faith or a desire to gain a tactical advantage in order for the Court of Appeals to affirm the exclusion of Dr. Bartelink's testimony.

Petitioner next takes issue with the Washington Court of Appeals' determination that the "impact of witness preclusion" factor of the *Taylor/Hutchinson* test weighed in favor of excluding Dr. Bartelink's testimony. (Pet.'s Resp. at 41-44.) The Court of Appeals concluded

REPORT AND RECOMMENDATION
PAGE - 31

that the impact of excluding the testimony was not significant and did not undermine Petitioner's defense. (*See* State Court Rec. (Dkt. # 15-1), Ex. 3 at 11.) The court acknowledged that only Dr. Bartelink used the radiocarbon testing method and that he estimated with "95% confidence" that the victim's minimum age at death was 15.6 years old. (*Id.*)  The court also noted that Dr. Bartelink's ultimate conclusion that the victim was between 15 and 20 years of age was cumulative of the age ranges testified to by multiple other experts. (*Id.*)

Petitioner offers a host of reasons why the Washington Court of Appeals' conclusion with respect to this factor was unreasonable, including that the trial judge had already accepted that the radiocarbon testing method to be used by Dr. Bartelink was "the most accurate." (Pet.'s Resp. at 42.) However, the trial judge did not conclude that the testing was more accurate than that conducted by the other experts, the trial judge merely accepted Dr. Bartelink's representation that radiocarbon testing of the teeth would result in a more accurate estimation of Petitioner's age than would other tests he had proposed that would require de-fleshing H.W.'s corpse. (State Court Rec. (Dkt. # 15-2), Ex. 20 at 28-29, 51-52.)

Petitioner also notes, correctly, that no other witness used radiocarbon dating to determine H.W.'s age and argues that they all used less accurate methods. (Pet.'s Resp. at 42.) However, while Dr. Bartelink opined in pre-trial testimony that radiocarbon dating would provide the most accurate estimation of age (*see* State Court Rec. (dkt. # 15-2), Ex. 20 at 28), it appears that the reference to "accuracy" was a reference to his testimony that the error range for estimation of age using radiocarbon testing was typically 1.5 years and the error range for estimation of age based upon an examination of bones was typically two to four years (*see id.*, Ex. 20 at 17-18, 28-29). Notably, Dr. Bartelink ultimately offered an age range of between 15 and 20 years which was as wide, or wider, than the ranges offered by the other experts.

REPORT AND RECOMMENDATION
PAGE - 32

1     Petitioner next argues that Dr. Bartelink's testimony was important because, while other

2     experts estimated age ranges where some part of the range was 16 or over, a much larger portion

3     of Dr. Bartelink's age range was above 16 years of age and his estimation of the minimum age at

4     death was actually 15.6 years, meaning that his range included only about five months when the

5     victim might have been under the threshold age of 16. (Pet.'s Resp. at 42-43.) However, three

6     other experts testified that H.W. was around 15 years old at the time of her death, with two

7     testifying they estimated her to be at least 15 years of age. (*See* State Court Rec. (Dkt. # 15-2),

8     Ex. 22 at 24, 62-63; State Court Rec. (Dkt. # 16-1), Exs. 27 at 32, Ex. 28 at 41-42.) The fact that

9     Dr. Bartelink would have testified to an age range of 15 to 20 years, albeit with a greater chance

10    the victim was over the age of 16, does not render his testimony so substantially different from

11    that of the other experts such that it was likely to have had a greater impact on the outcome of the

12    case.

13    Petitioner appears to further argue that Dr. Bartelink's testimony was necessary to

14    counter the testimony of Tenassay Wondetsaddik, H.W.'s relative from Ethiopia, despite the fact

15    that the trial judge ordered this witness's testimony stricken and instructed the jury not to

16    consider it.[3] (Pet.'s Resp. at 43.) Petitioner maintains it would have been difficult for a juror to

17    put out of his or her mind this witness's testimony that he was present when H.W. was born,

18    knew her birthdate, and knew she was 14 years old when she died. (*Id*.) According to Petitioner,

19    Dr. Bartelink would have testified to a reasonable degree of scientific certainty that H.W. could

20    not have been 13 or 14 years old at the time of her death. (*See id*. at 42-43; Lobsenz Decl., App.

21

22    _____

      [3] This witness's name is spelled various ways throughout the state court record and throughout

23    Petitioner's responsive brief. This Court has adopted the spelling used in the Washington Court of
      Appeals' decision on direct appeal. (*See* State Court Rec. (Dkt. # 15-1), Ex. 3 at 12.)

REPORT AND RECOMMENDATION
PAGE - 33

P, Declaration of Dr. Eric Bartelink at 5.) However, jurors are presumed to follow their instructions, *see Weeks v. Angelone*, 528 U.S. 225, 234 (2000) (citing, *Richardson v. Marsh*, 481 U.S. 200, 211 (1987)), and there was ample expert testimony, including Dr. Bartelink's proposed testimony, that would have placed the victim below the threshold age of 16 at the time of her death.

Finally, Petitioner argues in relation to the impact of exclusion of Dr. Bartelink's testimony that it "is indisputable that at least for one juror this was a close case," and she cites to the fact that after deliberating for two days the jury sent the trial judge a note asking if it were permissible to convict Petitioner of first-degree manslaughter if they could not agree on a verdict of homicide by abuse. (Pet.'s Resp. at 44.) The Court first observes that Petitioner misrepresents the question asked by the jury. The question submitted by the jury read as follows: "If we cannot come to a verdict on homicide by abuse for a defendant, does that preclude or prevent us from rendering a verdict on manslaughter." (Lobsenz Decl., App. T.) Petitioner, in her argument here, substitutes her name for the jury's term, "a defendant." (Pet.'s Resp. at 44.) This is significant because Petitioner was tried together with her husband, Larry Williams, and both were charged with both homicide by abuse and first-degree manslaughter. However, Larry Williams was convicted of only first-degree manslaughter as the jury could not reach a verdict on the homicide by abuse charge as to him. (*See* State Court Rec. (Dkt. # 15-1), Ex. 4 at 3 n.5.)

While Petitioner chooses to infer from the jury question that it was prompted by uncertainty regarding the victim's age at the time of her death, a more reasonable inference, when the question is viewed in light of the record as a whole, is that it was prompted by the jury's inability to reach a verdict on the homicide by abuse charge with respect to Larry

REPORT AND RECOMMENDATION
PAGE - 34

Williams. Nothing about the jury question reasonably suggests that Dr. Bartelink's testimony would have had any impact on the outcome of the case against Petitioner.

In sum, Petitioner fails to demonstrate that the Washington Court of Appeals' determinations with respect to the two contested *Taylor/Hutchinson* factors were based on an unreasonable determination of the facts and, thus, the Court of Appeals' conclusion with respect to the exclusion of Dr. Bartelink's testimony is entitled to deference.[4] As explained above, the Court of Appeals applied the proper standard to Petitioner's claim, even though it did not specifically reference the Sixth Amendment. The Court of Appeals also reasonably concluded, upon evaluating the evidence in the record in light of the *Taylor/Hutchinson* factors, that the trial court did not err in excluding Dr. Bartelink's testimony.

Even assuming Petitioner was able to demonstrate that the trial court erred in excluding Dr. Bartelink's testimony, and that such exclusion could reasonably be deemed to constitute a violation of her Sixth Amendment rights, Petitioner still has not demonstrated any entitlement to relief with respect to this claim. On federal habeas review, even if an error of constitutional dimension is established, a petitioner is entitled to relief only if she can demonstrate that the error resulted in actual prejudice. *Davis v. Ayala*, 576 U.S. 257, 267 (2015); *Brecht v. Abrahamson*, 507 U.S. 619, 637-38 (1993). This standard is satisfied if the record raises "grave doubt[s]" about whether the error influenced the jury's decision. *Ayala*, 576 U.S. at 276 (quoting *O'Neal v. McAninch*, 513 U.S. 432, 436 (1995)).

---

[4] While both Respondent and Petitioner discuss all four of the *Taylor/Hutchinson* factors in their briefing, this Court has limited its discussion to the two factors Petitioner argues were improperly decided by the Washington Court of Appeals based on its alleged unreasonable determination of the facts.

REPORT AND RECOMMENDATION
PAGE - 35

1   Petitioner argues that she has demonstrated the violation of her Sixth Amendment right to

2   present a defense had a substantial and injurious effect on the outcome of her case. (Pet.'s Resp.

3   at 45.) She offers in support of this argument the fact that the jury deliberated for more than two

4   days before sending the question to the court about whether it could render a verdict on the

5   manslaughter charge if it could not come to a verdict on the homicide by abuse charge. (*Id*. at

6   45-46.) For the reasons discussed above, the suggestion that the jury question was prompted by

7   uncertainty relating to the victim's age at the time of her death is untenable. The record does not

8   raise "grave doubts" about whether Petitioner would have been convicted if Dr. Bartelink's

9   testimony had not been excluded.

10   For all the foregoing reasons, Petitioner's federal habeas petition should be denied with

11   respect to her first ground for relief.

12           3.    *Ground Four - Sufficiency of the Evidence*

13   Petitioner asserts in her fourth ground for relief that she was denied her due process right

14   to proof beyond a reasonable doubt of every element of the charge of homicide by abuse due to

15   the insufficiency of the evidence to prove the victim was under 16 years of age at the time of her

16   death.[5] (Petition at 6, ¶ 5.4.)

17   The Due Process Clause of the Fourteenth Amendment requires that the prosecution

18   prove beyond a reasonable doubt each element of the charged offense. *Carella v. California*, 491

19   U.S. 263, 265 (1989) (citing *In re: Winship*, 397 U.S. 358, 364 (1970)). Due process claims

---

[5] Washington's homicide by abuse statute, RCW 9A.32.055, provides in relevant part as follows:

    (1) A person is guilty of homicide by abuse if, under circumstances manifesting an extreme indifference to human life, the person causes the death of a child or person under sixteen years of age, a developmentally disabled person, or a dependent adult, and the person has previously engaged in a pattern or practice of assault or torture of said child, person under sixteen years of age, developmentally disabled person, or dependent person.

REPORT AND RECOMMENDATION

PAGE - 36

challenging the sufficiency of the evidence are evaluated under the standard announced in *Jackson v. Virginia*, 443 U.S. 307 (1979). The Supreme Court explained in *Jackson* that the relevant question in evaluating a claim of insufficiency of the evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id*. at 319. This standard "must be applied with explicit reference to the substantive elements of the criminal offense as defined by state law." *Id*. at 324 n.16. The Supreme Court has made clear that it is the responsibility of the jury, and not a reviewing court, to decide what conclusions should be drawn from the evidence admitted at trial. *Cavazos v. Smith*, 565 U.S. 1, 2 (2011).

The Supreme Court has also made clear that sufficiency of the evidence claims are subject to a second layer of judicial deference on federal habeas review. Specifically, the Supreme Court has held that "a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was 'objectively unreasonable.'" *Coleman v. Johnson*, 566 U.S. 650, 651 (2012) (citing *Cavazos*, 565 U.S. at 2).

The Washington Court of Appeals, on direct review of Petitioner's conviction, concluded that sufficient evidence supported Petitioner's conviction for homicide by abuse. The court explained its conclusion as follows:

> Evidence is sufficient to support a conviction if any rational trier of fact could have found the crime's essential elements beyond a reasonable doubt. We view the evidence and all reasonable inferences from the evidence in the light most favorable to the State.
>
> Carri contends insufficient evidence supports that H.W. was under 16 years of age. A conviction for homicide by abuse, as charged here, requires that a person "causes the death of a child or person under sixteen years of age." The jury heard conflicting testimony from many experts about H.W.'s age. For example,

REPORT AND RECOMMENDATION
PAGE - 37

1   Dr. Gary Bell, a forensic dentist, testified that [H.W.] was "at least 15 years old,
but she could be anywhere from 13 to 18." Dr. David Sweet, a forensic dentist,
2   testified that H.W. was "16.25 years of age, . . .plus or minus . . . 1.5 years."
Katherine Taylor, a forensic anthropologist, testified that H.W. was between "13
3   to 17 years of age" and "right around 15 years of age." Dr. Jordan Haber, a
radiologist, testified that H.W. was "between 15 and 17 years old."
4
          Dr. Carolyn Roesler, a general medical practitioner in Australia, met H.W.
5   in December 2007 while volunteering in Ethiopia and last saw her in 2008. Dr.
Roesler observed H.W. on several occasions. She diagnosed and treated H.W. for
6   abdominal discomfort and an eye infection. Dr. Roesler also observed H.W.
exiting the shower once and saw no signs of breast development or pubic hair.
7   Based upon her observations, Dr. Roesler concluded H.W.'s "age was between
ten and eleven years old" when she saw H.W. in 2008. This would have made
8   H.W. 13 or 14 years old at the time of her death. Dr. Roesler's testimony
is sufficient to support the element that H.W. was under 16 years of age at the time
9   of her death.

10   (State Court Rec. (Dkt. # 15-1) Ex. 3 at 6-7 (footnotes omitted).)

11          Petitioner argues in her response to Respondent's answer that she is entitled to habeas

12   relief with respect to her sufficiency of the evidence claim because the Washington Court of

13   Appeals' application of *Jackson* was unreasonable. (Pet.'s Resp. at 31.) According to Petitioner,

14   an objectively reasonable state court could find it was *possible* H.W. was under the age of

15   sixteen when she died, but Petitioner argues this does not comport with the required

16   constitutional standard of proof beyond a reasonable doubt. (*Id.*) Petitioner argues—without

17   citation to any clearly established United States Supreme Court precedent—that where age is an

18   essential element of the crime, testimony that the victim's age is within a certain range, only part

19   of which meets the statutory age standard, is not constitutionally sufficient to support a

20   conviction. (*Id.* at 27.) Petitioner argues that "[w]hen the evidence presented does not permit the

21   trier of fact to know where within the range the true age lies, it is constitutionally impermissible

22   to reason that since the true age *could have been* low enough to prove the crime, that this is

23   sufficient." (*Id.*)

REPORT AND RECOMMENDATION
PAGE - 38

1    Petitioner goes on to summarize the testimony presented at trial regarding the victim's

2    age. (Pet.'s Resp. at 29-30.) Each of the experts who testified regarding the victim's likely age at

3    the time of her death provided an age range based on various methods. Dr. Gary Bell and Dr.

4    David Sweet, both of whom are forensic dentists, analyzed x-rays of the victim's teeth in order to

5    form an opinion regarding the victim's likely age at the time of her death. Dr. Bell opined that

6    the victim was at least 15 years of age at the time of her death but could be anywhere from 13 to

7    18 years of age. (*Id*. at 29; State Court Rec. (Dkt. # 16-1), Ex. 27 at 32.) Dr. Sweet opined that

8    the victim was 16.25 years of age but could be anywhere from 14.75 to 17.75 years of age.

9    (Pet.'s Resp. at 29; State Court Rec. (Dkt. # 16), Ex. 24 at 45-47.)

10    Dr. Katherine Taylor, a forensic anthropologist, and Dr. Jordan Haber, a radiologist,

11    analyzed x-rays of the victim's bones in order to form an opinion regarding the victim's likely

12    age at the time of her death. Dr. Taylor opined that the victim was between 13 and 17 years of

13    age at the time of her death but indicated as well that "the best estimate is right around 15."

14    (Pet.'s Resp. at 29; State Court Rec. (Dkt. # 16-1), Ex. 28 at 41-42.) Dr. Haber opined that the

15    victim was between 15 and 17 years of age at the time of her death. (Pet.'s Resp. at 29; State

16    Court Rec. (Dkt. # 15-2), Ex. 22 at 24, 41.)

17    Finally, Dr. Carolyn Roesler, a general medical practitioner in Australia, testified based

18    upon her visual observations of the victim's physical appearance and behaviors in 2008 at the

19    Ethiopian orphanage where the victim lived prior to coming to the United States. (State Court

20    Rec. (Dkt. # 15-2), Ex. 21 at 77, 85-101.) Dr. Roesler opined, based upon her observations, that

21    the victim was ten to eleven years old during that period of time. (*See id*., Ex. 21 at 87, 92-93,

22    116.) This would have made the victim 13 or 14 years old at the time she died in May 2011.

23

REPORT AND RECOMMENDATION
PAGE - 39

It is the responsibility of the trier of fact, and not a reviewing court, to decide what conclusions should be drawn from the evidence admitted at trial. *Cavazos*, 565 U.S. at 2. The Supreme Court has made clear that a reviewing court must be mindful of "the deference owed to the trier of fact and, correspondingly, the sharply limited nature of constitutional sufficiency review." *Wright v. West*, 505 U.S. 277, 296-97 (1992). In *West*, the Court emphasized the deference owed to the trier of fact:

> We said [in *Jackson*] that "*all of the evidence* is to be considered in the light most favorable to the prosecution" . . . that the prosecution need not affirmatively "rule out every hypothesis except that of guilt" . . . and that a reviewing court "faced with a record of historical facts that supports conflicting inferences must presume – even if it does not affirmatively appear in the record – that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution."

*West*, 505 U.S. at 296-97 (quoting *Jackson*, 443 U.S. at 326) (citations omitted, emphasis in original).

This Court has reviewed the transcripts of the testimony presented at trial and the remainder of the state court record presented for review. The record demonstrates that the Washington Court of Appeals applied the correct standard in evaluating Petitioner's sufficiency of the evidence claim. According deference to the jury's findings, and to the Court of Appeals' resolution of the claim in relation to the evidence presented at trial, this Court must conclude that the state court reasonably rejected Petitioner's challenge to the sufficiency of the evidence as there was, indeed, sufficient evidence from which the jury could conclude that the victim was under 16 years of age at the time of her death.

Petitioner's federal habeas petition should therefore be denied with respect to her fourth ground for relief.

REPORT AND RECOMMENDATION
PAGE - 40

    4.    *Grounds Five and Six - Constitutionality of Homicide by Abuse Statute*

Petitioner asserts in her fifth ground for federal habeas relief that she was denied her Fourteenth Amendment right to due process because the homicide by abuse statute is void for vagueness, both facially and as applied to her conduct. (Petition at 7, ¶ 5.5.) Petitioner asserts in her sixth ground for relief that she was denied her Fourteenth Amendment right to substantive due process because the homicide by abuse statute infringes upon the right to raise children without providing notice of the type of conduct that violates the statute. (*Id.*, ¶ 5.6.)

"It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). The United States Supreme Court has explained that "the void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolender v. Lawson*, 461 U.S. 352, 357 (1983). "[I]f arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them." *Grayned*, 408 U.S. at 108.

However, the prohibition against excessive vagueness "does not invalidate every statute which a reviewing court believes could have been drafted with greater precision." *Rose v. Locke*, 423 U.S. 48, 49 (1975); *Kolender*, 461 U.S. at 361 ("[D]ue process does not require impossible standards of clarity[.]" (internal quotations and citation omitted)). "The judgment of federal courts as to the vagueness or not of a state statute must be made in the light of prior state constructions of the statute. . . . When a state statute has been construed to forbid identifiable conduct so that 'interpretation by (the state court) puts these words in the statute as definitely as if it had been so amended by the legislature,' claims of impermissible vagueness must be judged

REPORT AND RECOMMENDATION
PAGE - 41

in that light." *Wainwright v. Stone*, 414 U.S. 21, 22-23 (1972) (quoting *Winters v. New York*, 333 U.S. 507, 514 (1948).

"Vagueness challenges to statutes not threatening First Amendment interests are examined in light of the facts of the case at hand; the statute is judged on an as-applied basis." *Maynard v. Cartwright*, 486 U.S. 356, 361 (1988); *Kashem v. Barr*, 941 F.3d 358, 375 (9th Cir. 2019). "A plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others." *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 495 (1982). Thus, as a general rule, a defendant who cannot sustain an as-applied vagueness challenge to a statute cannot be the one to make a facial challenge to the same statute. *Kashem*, 941 F.3d at 375.

Under RCW 9A.32.055(1), a person is guilty of homicide by abuse if "under circumstances manifesting an extreme indifference to human life, the person causes the death of a child . . ., and the person has previously engaged in a pattern or practice of assault or torture of said child." Petitioner argued on direct appeal that this statute is unconstitutionally vague as applied to her because the terms "torture" and "extreme indifference to human life" do not provide ascertainable standards to protect against arbitrary enforcement. (State Court Rec. (Dkt. # 15-1), Ex. 5 at 37-43.) Petitioner asserted in her personal restraint petition that the homicide by abuse statute is also facially void for vagueness, asserting that it infringes upon the substantive due process right of parents to discipline their children by failing to give notice of what conduct is prohibited. (*Id*., Ex. 12 at 87.) In her personal restraint proceeding, Petitioner focused in particular on the alleged vagueness of the statutory term "torture." (*Id*. at 92-99.)

The Washington Court of Appeals, on direct review of Petitioner's convictions, rejected her as applied challenge to the homicide by abuse statute, explaining its conclusion as follows:

REPORT AND RECOMMENDATION
PAGE - 42

Carri contends the terms "torture" and "extreme indifference to human life" as used in the homicide by abuse and first degree assault of a child statutes are unconstitutionally vague as applied to her. We disagree.

"We review constitutional issues de novo." The party challenging a statute has the heavy burden of proving unconstitutionality beyond a reasonable doubt. There is a "strong presumption in favor of the statute's validity." A statute is void for vagueness if it "does not define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is proscribed," or if it "does not provide ascertainable standards of guilt to protect against arbitrary enforcement." Carri argues only that the statutes lack ascertainable standards of guilt.

"Due process requires criminal statutes to establish workable standards that ensure the law will be enforced in a nonarbitrary, nondiscriminatory manner." A statute must contain ascertainable standards of guilt. Statutes are unconstitutionally vague when they rely upon "inherently subjective terms" that are amenable to varying and arbitrary interpretations.

The term "torture" is not defined by statute, but State v. Brown and State v. Russell are instructive. The Brown court held that the term "torture" as used in the second degree assault statute is not unconstitutionally vague. The Russell court held that the phrase "pattern or practice of assault or torture" in the homicide by abuse statute is not unconstitutionally vague. The Russell court concluded the homicide by abuse statute "sets ascertainable and adequate standards of guilt," and provides "adequate guidelines to prevent subjective enforcement."

Carri cites no authority to support that the term "extreme indifference" is unconstitutionally vague. Although the homicide by abuse statute does not define "extreme indifference," nothing suggests that it is inherently subjective and subject to arbitrary enforcement. The term "extreme" means "existing in the highest or the greatest possible degree; very great; very intense." The term "indifference" means "the quality or state of being indifferent." The term "indifferent" means "looked upon as not mattering in one way or another" or "regarded as being of no significant importance or value." The plain meaning of "extreme indifference" provides adequate guidelines to prevent arbitrary enforcement by a jury, judges, prosecutors, or police officers.

Therefore, we conclude the terms "extreme indifference" and "torture" provide an ascertainable standard of guilt and are not inherently subjective as applied to Carri's conduct.

(State Court Rec. (Dkt. # 15-1), Ex. 3 at 16-18 (citations omitted).)

REPORT AND RECOMMENDATION
PAGE - 43

1    Petitioner presents no substantive argument in either her petition or in her response to

2 Respondent's answer challenging the objective reasonableness of the Washington Court of

3 Appeals' decision with respect to her as applied challenge to the homicide by abuse statute.

4 Petitioner limits her argument in this federal habeas action to her facial challenge to the same

5 statute. It is therefore unclear whether Petitioner has abandoned her as applied challenge to the

6 statute or simply concedes that she has no viable argument to present. In this Court's view, such

7 a concession would be appropriate under the circumstances of this case.

8    The Washington Court of Appeals, in adjudicating Petitioner's as applied challenge to the

9 homicide by abuse statute, relied upon case law consistent with the standards set forth in

10 *Kolender*, 461 U.S. at 357, and *Hoffman Estates*, 455 U.S. at 498. The court then evaluated the

11 challenged terms in light of Washington case law construing those terms and reasonably

12 concluded that the terms provided "an ascertainable standard of guilt and [were] not inherently

13 subjective *as applied to Carri's conduct*." (State Court Rec. (Dkt. # 15-1), Ex. 3 at 18 (emphasis

14 added)).

15    The evidence in the record, as detailed by the Washington Court of Appeals in its opinion

16 disposing of Petitioner's personal restraint petition, amply supports the court's conclusion on

17 direct appeal that the homicide by abuse statute was not unconstitutionally vague as applied to

18 Petitioner. The victim, H.W., died in the early morning hours of May 12, 2011, after being found

19 naked and unconscious in the backyard of her home, having been required to remain outside

20 during much of the preceding day as punishment. (State Court Rec. (Dkt. # 15-1), Ex. 4 at 2,

21 10-14.) It was subsequently determined that H.W. died from hypothermia brought on by inflicted

22 starvation. (*Id.*, Ex. 4 at 2-3.)

23

REPORT AND RECOMMENDATION
PAGE - 44

An investigation following H.W.'s death revealed that Carri and Larry Williams routinely punished H.W. both physically and psychologically. (*See* State Court Rec. (Dkt. # 15-1), Ex. 4 at 2-3.) The punishments included regular beatings of H.W., deprivation of food, sometimes for up to two days at a time, or being served sub-standard food such as sandwiches soaked in water or frozen uncooked vegetables, while sitting alone on the floor inside away from the family table or alone outside on the back porch. (*Id.*, Ex. 4 at 3, 7-10.) H.W. was also forced to sleep, and sometimes eat, in a locked closet, and she was occasionally locked in the closet for up to 24 hours at a time. (*Id.*, Ex. 4 at 7-9.) H.W. lost thirty pounds in the last two years of her life, weighing only 78 pounds at the time of her death. (*Id.*, Ex. 4 at 9.) On the night of her death, H.W. was defiant, falling, and undressing, all of which expert testimony linked to severe malnutrition and hypothermia. (*Id.*, Ex. 4 at 14-15.) Petitioner testified at trial that she never sought professional medical or psychological advice, attributing the behaviors that resulted in H.W.'s punishments to her "rebelliousness." (*Id.*, Ex. 4 at 16.)

Under these facts, as established at trial, the Washington Court of Appeals reasonably concluded, that the terms "torture" and "extreme indifference to human life" were not unconstitutionally vague as they were not "inherently subjective" as applied to Petitioner's conduct. Petitioner offers no evidence or argument to the contrary in this federal habeas action.

The Court now turns to Petitioner's facial challenge which is the focus of her void for vagueness claim in this action. The Court of Appeals, on collateral review of Petitioner's conviction, rejected Petitioner's facial challenge to the constitutionality of the homicide by abuse statute, explaining its conclusion as follows:

> Carri contends the homicide by abuse statue is unconstitutionally vague
> because it fails to give notice of what types of parental discipline are prohibited.
> In her direct appeal, Carri raised a nearly identical argument, where she claimed

REPORT AND RECOMMENDATION
PAGE - 45

that the terms "torture" and "extreme indifference to human life" in the homicide by abuse statute were unconstitutionally vague as applied to her. This court rejected her vagueness argument.

In this petition, Carri characterizes her current vagueness challenge as a *facial*, rather than an *as-applied*, challenge to the statue. To succeed on a facial challenge, the complaining party must demonstrate that the law is impermissibly vague in all of its applications. Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 497, 102 S. Ct. 1186, 71 L. Ed. 2d 362 (1982); State v. Worrell, 111 Wn.2d 537, 541, 761 P.2d 56 (1988). A facial challenge must be rejected if there are any circumstances where the statute can constitutionally be applied. Washington State Republican Party v. Washington State Pub. Disclosure Comm'n 141 Wn.2d 245, 282 n.14, 4 P.3d 808 (2000). Carri does not argue that the homicide by abuse statute is impermissibly vague in all of its applications. She instead challenges that statute only in the context of parental discipline. This is in essence an as-applied challenge.

A petitioner may not renew an issue that was raised and rejected on direct appeal unless the interests of justice require the issue to be reexamined. Pirtle, 136 Wn.2d at 473. Because Carri raised, and this court rejected, her as-applied challenge to the homicide by abuse statute, and she advances no reasons for why the interests of justice require us to revisit the decision, we will not address this constitutional argument anew. We thus reject Carri's Claim 2.

(State Court Rec. (Dkt. # 15-1), Ex. 4 at 25-26.)

Petitioner argues that the Washington Court of Appeals erroneously viewed her facial challenge as, "in essence," the same as her applied challenge raised and rejected on direct appeal. (Pet.'s Resp. at 48.) Petitioner maintains that the court incorrectly concluded that in order to prevail on her facial vagueness claim she had to prove that the statute was impermissibly vague "in all its applications," an argument which she claims the United States Supreme Court has explicitly rejected. (*Id*.) Petitioner cites to the United States Supreme Court's decision in *Johnson v. United States*, 576 U.S. 591 (2015), to support her claim that the state appellate court applied the wrong standard to her facial vagueness challenge. (*Id*.)

In *Hoffman Estates*, the case relied upon by the Washington Court of Appeals in rejecting Petitioner's facial challenge, the United States Supreme Court held that when examining a facial

REPORT AND RECOMMENDATION
PAGE - 46

1   challenge to a statute, and "assuming the enactment implicates no constitutionally protected

2   conduct," a reviewing court "should uphold the challenge only if the enactment is impermissibly

3   vague in all of its applications." *Hoffman Estates*, 455 U.S. at 494-95. The *Hoffman Estates*

4   Court then went on to explain that "[a] plaintiff who engages in some conduct that is clearly

5   proscribed cannot complain of the vagueness of the law as applied to the conduct of others." In a

6   footnote, the *Hoffman Estates* Court highlighted the principle, well established in Supreme Court

7   jurisprudence, that: "[V]agueness challenges to statutes which do not involve First Amendment

8   freedoms must be examined in the light of the facts of the case at hand." *Id*. at 495 n.7.

9       In *Johnson*, the Supreme Court considered a challenge to the imposition of an increased

10  sentence under the residual clause of the Armed Career Criminal Act ("ACCA"). The residual

11  clause defined a "violent felony" to include offenses that presented "a serious risk of physical

12  injury to another." *See Johnson*, 576 U.S. at 594 (quoting 18 U.S.C. § 924(e)(2)(B)). Courts, in

13  applying the residual clause, were required to "picture the kind of conduct that the crime

14  involves in 'the ordinary case,' and to judge whether that abstraction presents a serious potential

15  risk of physical harm." *Id*. at 596 (quoting *James v. United States*, 550 U.S. 192, 208 (2007)).

16  The *Johnson* court concluded that "[b]y combining indeterminacy about how to measure the risk

17  it takes for the crime to qualify as a violent felony, the residual clause produces more

18  unpredictability and arbitrariness than the Due Process Clause tolerates." *Id*. at 598. The

19  Supreme Court, in reaching its decision in *Johnson*, rejected the proposition that a statute is void

20  for vagueness only if it is void "in all of its applications." *Id*. at 603.

21      The *Johnson* Court did not, however, expressly overrule *Hoffman Estates*, and it is

22  unclear the extent to which its rejection of the proposition that a statute is void for vagueness

23  only if it is void in all of its applications applies outside the context of the Court's residual clause

REPORT AND RECOMMENDATION

PAGE - 47

cases. *See Sessions v. Dimaya*, 138 S. Ct. 1204, 1250 (2018) (Thomas, J., dissenting) (Noting that *Johnson* did not overrule *Hoffman Estates*, and further noting that *Johnson* merely "weakened the principle that a facial challenge requires a statute to be vague 'in all applications.'").

In *Bosse v. Oklahoma*, 137 S. Ct. 1 (2016), the Supreme Court made clear that "[i]t is this Court's prerogative alone to overrule one of its precedents. . . . Our decisions remain binding precedent until we see fit to reconsider them, regardless of whether subsequent cases have raised doubts about their continuing vitality." *Id*. at 2 (internal quotations and citations omitted). The Supreme Court has also explained that "[i]f a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions." *Rodriguez de Quijas v. Shearson/American Express, Inc.*, 490 U.S. 477, 484 (1989). Given that *Hoffman Estates* has not been overruled, the Washington Court of Appeals, in relying on that decision to reject Petitioner's facial challenge to the homicide by abuse statute, did not apply a rule that is "contrary to" clearly established federal law.

Even assuming the Washington Court of Appeals' reliance on the rule that a facial challenge requires a statute to be vague in all its applications was improper in light of *Johnson*, Petitioner is still not entitled to relief in this federal habeas action. As Justice Thomas noted in his dissent in *Dimaya*, the *Johnson* Court did not overrule its line of precedent recognizing that, outside the First Amendment context, an individual who challenges a vague statute must prove that the statute is vague as applied to her. *Dimaya*, 138 S. Ct. at 1250 (Thomas, J., dissenting). The Ninth Circuit has also concluded that *Johnson* and *Dimaya* "did not alter the general rule that a defendant whose conduct is clearly prohibited cannot be the one to make a facial

REPORT AND RECOMMENDATION
PAGE - 48

1    vagueness challenge to a statute." *Kashem*, 941 F.3d at 375. In reaching this conclusion, the

2    *Kashem* Court explained that this principle "rests on an independent foundation, apart from the

3    vague-in-all-applications rule." *Id*. The Ninth Circuit relied upon the Supreme Court's decision

4    in *Broadrick v. Oklahoma*, 413 U.S. 601 (1973), to support this proposition. In *Broadrick*, the

5    Supreme Court explained:

6            Embedded in the traditional rules governing constitutional adjudication is
     the principle that a person to whom a statute may constitutionally be applied will
7    not be heard to challenge that statute on the ground that it may conceivably be
     applied unconstitutionally to others, in other situations not before the Court. A
8    closely related principle is that constitutional rights are personal and may not be
     asserted vicariously. These principles rest on more than the fussiness of judges.
9    They reflect the conviction that under our constitutional system courts are not
     roving commissions assigned to pass judgment on the validity of the Nation's
10   laws. Constitutional judgments, as Mr. Chief Justice Marshall recognized, are
     justified only out of the necessity of adjudicating rights in particular cases
11   between the litigants brought before the Court . . . .

12   *Broadrick*, 413 U.S. at 610-11 (citations omitted)).

13           In this Court's view, the principles announced in *Broadrick* support the Washington

14   Court of Appeals' conclusion that Petitioner's facial challenge was, in essence, an as applied

15   challenge. They also foreclose Petitioner's argument that she is entitled to raise a facial challenge

16   to the statute under which she was convicted because, as discussed above, Petitioner's conduct

17   was clearly prohibited by that same statute. Petitioner makes no attempt in this federal habeas

18   proceeding to demonstrate otherwise.

19           Finally, the Court observes that the Washington Court of Appeals, in rejecting

20   Petitioner's claim that the homicide by abuse statute was not vague as applied to her, necessarily

21   disposed of her substantive due process right to parent claim. As the Supreme Court made clear

22   in *Troxel v. Granville*, 530 U.S. 57, 66 (2000), "[t]he Due Process Clause of the Fourteenth

23   Amendment protects the fundamental right of parents to make decisions concerning the care,

REPORT AND RECOMMENDATION
PAGE - 49

custody, and control of their children." However, as Respondent correctly points out, this due process right did not permit Petitioner to torture her child and thereby cause the child's death as proscribed by RCW 9A.32.055.

For the foregoing reasons, Petitioner's federal habeas petition should be denied with respect to her fifth, and sixth grounds for relief.

## V.     CERTIFICATE OF APPEALABILITY

A petitioner seeking post-conviction relief under § 2254 may appeal a district court's dismissal of her federal habeas petition only after obtaining a certificate of appealability from a district or circuit judge. A certificate of appealability may issue only where a petitioner has made "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(3). A petitioner satisfies this standard "by demonstrating that jurists of reason could disagree with the district court's resolution of [her] constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). Under this standard, this Court concludes that Petitioner is not entitled to a certificate of appealability with respect to any of the claims asserted in her petition.

## VI.     CONCLUSION

For the reasons set forth above, this Court recommends that Petitioner's petition for writ of habeas corpus (dkt. # 1) be denied, and that this action be dismissed with prejudice. This Court further recommends that a certificate of appealability be denied. A proposed order accompanies this Report and Recommendation.

Objections to this Report and Recommendation, if any, should be filed with the Clerk and served upon all parties to this suit within **twenty-one (21) days** of the date on which this Report and Recommendation is signed. Failure to file objections within the specified time may affect your

REPORT AND RECOMMENDATION
PAGE - 50

right to appeal. Objections should be noted for consideration on the District Judge's motions calendar for the third Friday after they are filed. Responses to objections may be filed within **fourteen (14) days** after service of objections. If no timely objections are filed, the matter will be ready for consideration by the District Judge on **November 26, 2021**.

The Clerk is directed to send copies of this Report and Recommendation to the parties and to the Honorable Robert S. Lasnik.

DATED this 2nd day of November, 2021.

MICHELLE L. PETERSON
United States Magistrate Judge

REPORT AND RECOMMENDATION
PAGE - 51